Please the court. My name is Robert Epstein. I'm here today on behalf of the appellant, Mr. Sean Lowe. With the court's permission, I'd like to reserve five minutes of my time for rebuttal. Okay. Let me ask this. Obviously, this was remanded, and I spent more time than I care to admit trying to figure out the sequence of events here, and that's why we remanded it. And after reading Judge Joyner's findings of fact, and looking at the findings of fact, I'm still spending more time than I care to admit trying to figure out what happened here. Maybe you can help me. According to the findings of fact, the officer's approach, as they approached Appellant Lowe, stepped back sometime in the sequence, and then he was stopped by the fence. Five to ten commands were given to take your hands out of your pocket. Sometime between the officers stepping out of the car and Lowe stepping back and hitting the fence, the officers drew their gun. I can't tell if they drew their gun after the first command to take your hands out of your pocket, the tenth command to take your hands out of the pocket, before any command to take your hands out of the pocket. Maybe you can help me. And if that question cannot be answered, why shouldn't we send this back to Judge Joyner yet again? Well, I don't think it's entirely clear from Officer McGinnis' testimony as to whether he took the gun out after the very first command or after a couple of commands had been given. I don't think this Court needs to send it back for that issue, though, because I think regardless of when Officer McGinnis drew his gun, what is clear is that the officers made a show of authority at the very beginning of this encounter. So isn't that enough? Doesn't he have to submit to the authority? Well, Judge Joyner found that Mr. Lowe did submit. He submitted by staying put. He submitted by not attempting to play. And what had happened before he submitted? That's my problem. What had happened? How many commands had been given? Had the gun been produced? What had happened? Well, Judge Joyner found that the show of authority was the second command for Mr. Lowe to raise his hands. And that Mr. Lowe submitted to that show of authority by staying put. Where did he find that? At conclusion of Law No. 9 and No. 10. No. 9 relates to the show of authority when the officers repeated their commands. No. 10 is that Lowe submitted to the show of authority by not fleeing from them, by staying put, by staying in front of the house. Now, there is no dispute between the parties as far as I can tell that Judge Joyner was wrong as to the claiming of the show of authority. That as a matter of law, no later than the very first command for Lowe to take his hands out of his pocket, that's a show of authority. That communicates to any objective, reasonable person that they are not free to leave. Mr. Epstein, you would agree that if on that first command that your client turned around and fled, that at that point, there would be reasonable suspicion? The fleeing would give the officers reasonable suspicion. Why are you saying that? Because... Before I leave this court, I'm going to put language and word law into context. If it kills me, it may. Why are you saying that? I'm saying that because the Supreme Court in Wardle found that the combination, that the officers there were coming to a high crime area, and that Wardle took off and ran as soon as he saw them. The Supreme Court found in that case... What did he have in his hand when he ran? I forget, Your Honor, whether it was drugs or guns. And what were the officers expecting to find? First of all, it was a caravan of police cars. Right. And what were they expecting to find when they came around the corner and saw Wardle? I think they were hoping to see a drug transaction. Well, the way the opinion is worded, they came around the corner expecting to find drug dealers and drug purchasers. They see Wardle with a paper bag in his hand, consistent with the scenario of a drug deal, and he runs. And the language of the court is flight plus, there's a rise to reasonable suspicion. In that case, the plus was expecting to find drug dealers and drug purchasers, seeing somebody with a paper bag in his hand in a high drug, high crime area, run upon seeing a caravan of cleanly marked police cars. Now, help me understand your yes in this case. I think you're absolutely correct, Your Honor. Your Honor, I think maybe I'm too quick to concede that if Mr. Lowe had took off running, that the officers would have had reasonable suspicion there. So is that yes, no, or no? I think, Your Honor, is leading me to a no. I think in this case. That's leading you to a no. No, I think Your Honor is correct. I think in this case we have the exact opposite of him taking off and running. Do you need to get to that point? Here's what I think. Everyone's confused about something here. Here's my point. I don't know that you ever need to get to the hypothetical, right, because if I'm understanding the facts, you have the show of authority, whether it's the first command or right after the first command, and you have a submission to the show of authority. And you have the submission to the show of authority before any movement that he makes.  And Johnson says you can't use anything after the submission to the show of authority to boost reasonable suspicion. Yes. So, yes, you're agreeing with that. No, that's exactly right. That's the first point of our brief. That's the first part of our argument. So isn't that the end of the inquiry then? Absolutely. This Court does not even need to reach the second part of the argument, which is whether the failure on those parts immediately raises hands, whether that would constitute giving the officers reasonable suspicion they didn't have. You don't need to get to that because he's already seized before that point. But the question for us is when is that submission? And so if we think under Werdlow and Hodari that with the additional factors here, a tip with pretty specific information, 4 a.m. timing, a high crime neighborhood, someone fitting exactly that description, and then the instruction whether it's to stop or put up hands, if someone fled under those circumstances, let's assume that that would be reasonable suspicion. The question is where we stop, where we look at the timing. Right. So we don't have turning around and fleeing here, but we do have a finding by the district court not of staying in place, but of retreating several steps until he was prevented from retreating more by a fence. Why isn't that akin to the evasive behavior of flight? Well, the Court didn't find that it was. And let's look exactly at the Court's findings as to the sequence. I think it's very important because the Court found submission as of the second command, and the Court found that commands were coming from multiple officers, so they're coming one after another. I'm trying to find where that last statement is. I'm looking at paragraph 9 and 10. It's not there. That the commands were coming from multiple officers? Not that, but when exactly the submission was. So conclusion of law number 10 is Lowe submitted to the show of authority by not fleeing from them. Okay, I'm looking at paragraph 10 of that. So that's no later than the second command, obviously. But we have to make a determination about when submission occurred as well. Correct. And it may be that we adopt the same reasoning as the district courts or we use different reasoning to come to the same or different conclusion. I'd like your independent view on that question, whether there is evasive action in not staying put, but retreating several steps until he was prevented from retreating further by the construction fence. Well, let's look at exactly what the district court found in that regard. If you look at finding of fact number 6, you have the fact that the officers get out of their carts 50 to 60 feet away from Mr. Lowe. That's where they start their approach from. Finding of fact number 19, as the officers moved towards Lowe, he took several steps back into the construction fence. Now, this is a fence on the street separating one row house from the next. So it would be akin to if you're in Ms. Witherspoon's position and I'm in Mr. Lowe's position and I hear the police coming from the left, I turn, I look at them, I take a couple of steps back, there's a fence right there. That's what the district court found in finding of fact number 19. A couple of steps, several steps, a few steps back into the fence right behind them. Then this is critical. In finding of fact number 20, the court finds when the officers got into close proximity to him, that's when they started making the commands to raise his hand. By that point, he's already stopped. There is no finding by the district court that Mr. Lowe ever took a step away from the officers after they made their first command to him to raise his hands. But as Chief Judge McKee has pointed out, the district court really didn't provide us with the particular sequencing of those events. It says in 19 and 20 that those occurred, but are you suggesting that simply by the order that they appear, that that's necessarily chronological sequencing? Well, thank you. In 20, it's not just the order. 19 and 20, it's not just the order. It's the fact that the district court found that it wasn't until they got into close proximity to him. Well, how do you find close proximity? If the car stops 60 feet away and he ends up being the closest officer, ends up 10 feet away, is close proximity 20 feet away? Is it 10 feet away? And how many verbal commands are being given in the process of that? Well, I think the court here is looking at Officer Prozac's testimony, who testified at page 154 that the officers were only 6 to 8 feet away from Mr. Lowe, Officers McGinnis and Campbell, when they were giving him these commands. So the district court has found that as the officers begin their approach, he takes a couple of steps back. That's almost instantaneous. When the officers get to close proximity, they then start making their commands. He's already stopped at that point. So we have a show of authority that's at the first command. No dispute about that. And he's already submitted by staying put. He is seized before we get into any questions about whether he has to remove his hand. And there's no kind of hand movement. It's just that his hands stay exactly still, exactly as they were when they began his approach. Isn't it the case on this record that the entire sequence of events from the officer's testimony occurs within two minutes and that at least one minute of that involves the struggle at the fence after he's already turned himself or been turned and the struggle over the weapon? So then we're talking about a period of 30 to 60 seconds where the officers are approaching. They're giving the command to show hands. According to the findings of the district court, Lowe is retreating. Retreating. He says he takes a couple of steps backward. If he takes a couple of steps like this. How do you define retreat? Retreating would be as if he's looking to get away from the officer. And it's critical. Officer Campbell testified he had an opportunity to try to run away. If he wanted to retreat from the officers and get away from them, he could have ran out into the street. The officers were coming from the south. He could have ran up the block to the north. But he didn't do that. He took a couple of steps and stopped. The district court found that he was prevented from moving farther back. He was prevented from moving further back on the sidewalk. But Officer Campbell testified, and this was undisputed, he certainly could have ran into the street and ran up the block. But he didn't do that. He submitted by staying right where he was, right in front of Ms. Witherspoon's home. And how many commands have been given at that point? None. That's just it. The court did not find that there was a single step away from the officers after the first command was given. Officers from the U.S. Did you get anything else in Paragraph 19 or Paragraph 11 or a combination? Paragraph 19 and 20 of the findings of fact, there is nothing in that the court never says anything about there being a step away from the officers after the first command is given. And you would think if the district court had made such a finding, if the district court was of that mind, the district court certainly would have included that in its reasonable suspicion analysis. In 11, the court says only after five to ten commands were given did Lowe take his hands out of his pockets and slowly move towards the wall. When I read slowly move towards the wall, I'm assuming that what that is referring to is the few steps backward. No, no, Your Honor. The officers commanded him, after commanding him to take his hands out of his pockets, after pointing a gun at him and forcing him to take his hands out of his pockets, they then told him to go over to the wall of the house and put his hands up on the wall. Where is that in the district court's findings? Excuse me? Where is that in the district court's findings? Okay, we'll get a chance when we hear from Mr. Zosmer. Good afternoon, Your Honor. May I please the court? Robert Zosmer on behalf of the government. The most important point I would like to make in today's argument is that it doesn't matter when you identify the seizure here. There was reasonable suspicion at that moment. Why is that? Because if you stop, since you said we can stop at any point in time, if you take the point in time after he's received a couple of commands and he's backed up and he's up against the fence and you say that is a submission to the show of authority, what are all of the facts that add up to reasonable suspicion at that point? Well, here's why, Your Honor. And I think Your Honor's question earlier touched on it, but with one factual correction I'd like to make. And if I could explain this for a minute. We know that what a seizure is is two things. It's a show of authority plus submission to the show of authority. You have to have both or you don't have a seizure. The show of authority, everybody here seems to agree, including the district court, is the command, show us your hands. This is not a case, and that's what makes this case a little different from some of the others. This is not a case where the command was stop in the name of the law or grabbing somebody. The show of authority here is show us your hands. And what we know very clearly from the district court's findings, I'll agree, it didn't make a finding regarding every last split second, but the very important finding that it did make is that he did not initially show his hands when he was asked to. And it took at least several commands and backing up before he did. So we know that when he... When you say backing up, that's not clear. Well, it's not. And that's what I'm getting to as to why it doesn't matter. The show of authority is show us your hands. The best case scenario, I don't think it's supported by the law. You say you submit to show us your hand by doing nothing, by just remaining motionless. You're submitting to authority? Yes. And that's what the precedent is, is if he stands still in response to the show of authority, he has submitted. And anything that takes place... That's you heads that win, tails you lose. You're saying if he stands still, he has submitted. But I assume you'd say if he didn't stand still, if he took off, that would be reasonable suspicion that would give rise to grounds for a seizure. Well, that would be an extra fact. But I'm giving the defense... But he wouldn't either way, though. Well, he didn't flee. He did back up. Look, our position in the district court originally was that, and this is taking me off of the track I started on but that I need to get back to, our initial position in the district court was there was never a seizure. And the reason there was never a seizure is because he never submitted. All he ever did was momentarily comply. Well, if you could tell Mr. Lowe when he was brought in, I wasn't there, but I'm assuming that he followed normal parlance here. Sometime between the time the anonymous call comes out, black male, hoody, has a gun, sometime between that and the time they bring Lowe into the courtroom to be sentenced in handcuffs, if you were to tell him he was never seized, he'd probably be surprised to hear that. Oh, no. What I'm saying, Your Honor, is that, of course, I'm saying he was never seized until the struggle and the recovery of the gun because all he did was first he backed up. He had nowhere to go. He slowly, reluctantly went to the wall. His hands were on the wall for a second before he's reaching for the gun in his waistband. We can't conflate those facts, though. Here's the question that I have for you. How do we even get to the point in time when he's going for the gun? Whether the submission to authority is backing up and no place to go, if you assume that the momentary retreat is some act of evasion, certainly you're up against the fence. That's it, right? And then if you are commanded and you comply with the command to go put your hands on the wall, why isn't that, those two acts, the submission to authority before you get to the jostling? Well, I can answer that, but I don't think it's the – I'm trying to give the defense the benefit of the doubt before I get to that. Okay. The answer to your question – Aren't you relieved to hear that, Mr. Rustin? You can just sit back and relax. You can rest on his argument now. The answer to your question, so I don't ignore your question, is that this court has said many times that momentary compliance does not amount to submission to authority. And when you have somebody who's jockeying around, weighing his options, there's the case – I don't remember the name of this – second, where you put your hands on the car for two seconds. Four cops approach you at 4 in the morning and taking two steps back. Look, it's his girlfriend's house. He knows there's a fence behind him, right? I mean, can we assume that for a second? And he backs up? I mean, weighing his options, it seems to be putting a lot on the table. Yeah, that's the precedent. But let me get back to the benefit of the doubt, if I may. The best-case scenario for the defense is that none of this happens, the backing up, the struggle, nothing. What happens is they come up on him. They say, show us your hands. At that moment, where are his hands? They are stuffed into the pocket of his jacket. And the best-case scenario for the defense is he stands frozen. When given that command, stay where you are, he stands with his hands still in his pocket. Wait, that command is not the same command. Excuse me? That's a very different command. You're saying the command, stay where you are. No, no, the command – I'm sorry, thank you for correcting me. The command is, show us your hands. And in response to that, the best-case scenario for the defense is two things happen. One is, he stands still. And the second is, he does not show his hands. That's what's happening simultaneously. Best-case scenario. Okay, so you would then agree that at that point, applying Johnson, that would be a submission to a show of authority. If that's what happened, yes. Now, that's not the district court's findings. So I'm giving them the benefit of the doubt. Why isn't that? Because the district court found that he did back up, and thus he didn't submit. It also found that the commands were repeated before he finally took his hands out of his pocket. What do we make of those findings when the district court describes taking several steps back, but at 4 in the morning with four people running at you in the dark and yelling things, that that may well be consistent, too, with trying to just ascertain the situation  How do we, without findings by the district court, determine that that was an attempted flight? And how, without sequencing provided by the district court, do we know what order these things actually happened? I agree, Your Honor, that it would be helpful to have more specific findings. But the reason I'm trying to say that that's not necessary is, again, this benefit of the doubt. That if you go back, if you say that the backing up never happened, that the submission happened before that, if he stood still with his hands in his pockets, that they had reasonable suspicion at that moment. That's what I'm getting to. But you can see that they did not have reasonable suspicion when they pulled up on the scene. Correct. Because all they had at that point was an anonymous tip of a gun. Florida v. J.L. says that that's not enough. But now they had one fact more. The command was, show us your hands. But if that happened at the moment I'm sorry. If refusal to comply doesn't give you reasonable suspicion, then how can that fact be the tipping factor? But it does give you reasonable suspicion. Because what the Supreme Court has repeatedly held is the officer can consider all facts, whether it's innocent conduct, illegal conduct. All facts as of the moment of seizure. But they've also said in Bostic that an officer is taking this as a, quote, friendly encounter. The citizen is not under any obligation to cooperate with police. In other words, you can turn and go on about your business. And it's a term, but they can go to the inquiry and go on about your business. Absolutely. But that's different from saying that you can't consider that fact in the reasonable suspicion calculus. And the court has never said that. And Wardlow defeats that. So it says that win tells you lose. In this particular case, yes. Wardlow shows that. Wardlow, the gentleman, sees the police coming up and he takes off running. If I did that today, if I were on Market Street and I saw a police car and I ran, that would not give the police reasonable suspicion. They may think it's suspicious, but it's not enough by itself. But if your argument is coming down to it happening simultaneously, then doesn't the government lose? Because our case law doesn't seem to support that you look beyond that moment of seizure to determine whether there was a refusal to comply with the command. You don't continue to look for reasonable suspicion when that moment of seizure has already happened. I agree. But the moment of seizure here, Your Honor, is simultaneous with him not showing his hands. If they want the show of authority to be show us your hands, the officers can consider the response, which is simultaneous, they say. If it's simultaneous, how is that giving him a chance to comply? Well, we don't have to, I don't think any case is held that we look at this in milliseconds. This is happening, they can see immediately whether he's complying with the command or not. As it turns out, according to the district court, it takes many commands and one officer pulls his gun. Now I'm going to get away from the benefit of the doubt in a minute because I don't think they deserve the benefit of the doubt, but I'm trying to suggest why this case is not difficult. The officer can assess at the moment he's stopped what's he doing, and his hands are still in his pockets. And that's where, at this moment, this is an incredibly dangerous situation. And what's troubling about this argument that we've now had twice is that we have these arguments, and of course it's completely appropriate, but we stand here on the 19th floor of the courthouse with everybody, very civil and quiet, and dissect this. But that's not what these police officers are doing. There are police officers with guns looking at a person. They're all there looking at him. You know, you're right. It is a situation fraught with danger. I get that. But, you know, there has to be a point in time where we have to say, is this a seizure? And I haven't heard anything to convince me that after he's up against the fence, it's not a seizure at that point. It is a seizure. We are not disputing the district court's findings here. It didn't accept our original argument. It is a seizure by the time he's up against the fence. And we think that any reasonable, now I'm getting away from the benefit of the doubt, any reasonable reading of the district court's findings is that by that point, the officers have made multiple commands that he has not complied with, and that not complying with taking his hands out has already happened, the district court says. And, therefore, it says you can consider it in the reasonable suspicion calculus. There's no other logical way to read the district court's findings. As far as the four officers go, Your Honor, they're doing their job. They get a report of a man with a gun at 4 in the morning. They don't head off in the other direction. They go to the scene to find out what's happening and to protect the public. They come up on this man who matches the description, and the one command they give him is the most obvious command, take your hands out of your pockets so we can safely investigate this. What we really have to emphasize here is we are dealing with a Terry stop. This is not an arrest. This is not a conviction. This is a Terry stop. It's a low threshold. And the reason it's a low threshold, the Supreme Court tells us, is it's just to allow an investigation, and it's to allow the officers to stay safe during the investigation, both themselves and the people around them. So it's a reasonable suspicion standard. It is less than probable cause. It is less than preponderance, less than reasonable doubt. It is saying, would a reasonably prudent person be concerned for his or her safety? And when you have an officer come up. Let me ask a different question, though. When you're talking about a situation which gets you basically to the pat-down and the frisk and the rationale which allows that, and the momentary interruption where the person is limited to come and go, I'm not sure that's the same inquiry that we have to undertake to determine, is there a seizure beyond the momentary stop and frisk point? Because that's what we have here. We have something which began as a Terry stop when they basically approached the guy and began questioning him. That's classic Terry. But this went beyond Terry pretty quickly, and I'm not sure at what point it got past Terry, what had happened when it got past Terry, and what the sequence of events was. Well, the defense has never challenged that. Their challenge has been you shouldn't have done the Terry stop. Everybody recognizes that if you do a valid Terry stop, you pat down, you feel the gun, and then you have a valid arrest. That brings me to a very important point. But you don't pull a gun during a Terry stop. Excuse me? You don't really pull a gun out during a Terry stop. No, but you can, and this Court has addressed that depending on the circumstances. Well, here's what I don't get. If Johnson says the refusal to comply can't be used for reasonable suspicion, then what are we to do with the facts that you continue to tell us we should look at, which is show us your hands, show us your hands, show us your hands, refusal to comply, refusal to comply, refusal to comply. Then you say he's up against the fence. Okay, it's a seizure now. So if we can't use those facts, the refusal to comply for reasonable suspicion, how do we get to where you want us to be? Well, I don't agree with that, Your Honor. I think Jim Johnson, that statement is in the context. Which Johnson? Johnson v. Campbell I think you're referring to. That statement is in the context of the particular facts of that case in which the only noncompliance is not rolling down the window, the man just sitting in his car in the parking lot. If that, this Court has never explicitly said you can't consider the refusal to comply. If it did say that, it would be in direct conflict with the Supreme Court, in Hodari, in Arvizu. In many cases where the Supreme Court makes clear. But those were flight cases. Hodari is different because that's dealing with flight. Well, Hodari, the state agrees that it did not have cause to chase this person, and yet the Supreme Court considers the result of that chase because the seizure hasn't happened yet. It couldn't be clearer. On Arvizu, the Supreme Court makes explicit you can't slice and dice. You have to look at all things that happen, including innocent things, in the totality of the circumstances. So it is flatly incorrect, I respectfully say, to suggest that you can't consider the response to the command. That's what this is all about. Where have we said that you can consider that simultaneously with the submission, with the seizure? Well, I don't know that we've had a case like this in which it's been that important, Your Honor. Is it the government's position here that the seizure or submission happened on that second or subsequent commands or happened at the point that he turns to the fence and put his hands on the fence? What is your position before us? We believe the district court is correct. The submission happens after the first commands, after he backs up a bit. It doesn't say that timing explicitly, but it's implicit in the court's findings. If the submission happened after the first command, why was it necessary to give five to ten commands? Well, that's when the seizure happens, according to the district court. He still, even after he stops, is not taking his hands out. So the point at which someone submits, that's seizure. Right, but according to the district court, he doesn't take his hands out before the seizure. He still doesn't take his hands out after the seizure. We can focus on what happens before. So our position is that the moment of seizure really is after he backs up a couple steps and has already failed to comply with some orders. At that point, there's reasonable suspicion based on his failure to take his hands out. What I've been suggesting, in addition, is that even if the defense is right, that the backing up didn't happen and that he immediately froze with his hands in his pockets, even that is enough. One more point I'd like to make, if I may. Let me understand that. That one I just don't get, how that's enough. If the police approach him, he just stands there. You're saying that's enough. Absolutely. And here's the interesting thing. Why is that? Again, we are really backing up. Because any police officer, at 4 in the morning, in a place where shots were fired around the corner an hour before, in a high-crime area, seeing a specific description of a person who's said to have a gun, standing with a young woman. We don't know whether she's there willingly or in danger. And then the first thing this person does. That's moving the lily. There's nothing here to suggest that the police were concerned with his phone. I think they're concerned with everybody. And the first thing he does is refuse to show his hands. But if his refusal to show his hands in response to the second command is submission, why isn't that equally true of his failure to respond to the first command? Submission is not the refusal to show his hands. Submission, according to the district court, is standing still and not fleeing. And that is consistent with this court's precedent. That's true of the first response, as it is to the second. So if that is sufficient, in the government's view, using the district court's rationale for that to be the moment of submission or seizure, why doesn't that apply equally to his response to the first command, at which point there's no other information beyond the tip and basically an anonymous tip, the high-crime neighborhood and the hour of the morning. Because you focus on the information available in totality at the moment of seizure. The moment of seizure, according to the district court, is after he's backed up. By that point, he has failed to comply with commands to take out his hands. You can consider that failure. I also suggest as an alternative that even if he stopped and didn't take his hands out at the first command, and that is the seizure, the totality of the circumstances include the refusal to take his hands out, which creates reasonable suspicion. And that's the last point I want to make, if I may, which is most interesting in this case is that the defense has never disputed what I just said about reasonable suspicion, that if you add in not showing your hands to the other circumstances that we know, they've never disputed it. Instead, we've had changing positions here. The first position that led us to the first appeal, the defense argument was he did show his hands. They needed to get away from that fact. They relied on Campbell's testimony and on Ms. Witherspoon and said he did show his hands in response to the command. That's the important thing that comes from the district court's new findings. It rejected that. And so we come here now with a new argument, which is that actually they didn't make it in their main argument here, but the main argument in the brief was, well, they shouldn't have ordered him not to show his hands at all, something we haven't discussed. The reason we keep dancing around all this is because we think everybody has to agree and they seem to that if you have a high crime area, 4 a.m. exact description, shots fired, and you won't show your hands when the police ask you to, that creates that minimal threshold that allows them to pat him down for his safety. Thank you very much, Your Honor. Thank you. Mr. Epstein? Your Honor, if I may begin, one of you had asked me before I sat down about him, Mr. Lowe, putting his hands up on the wall or the fact that he walked over and put his hands up on the wall and what was that referring to. That was in response, after he had already shown his hands, that the officers then commanded him to put his hands up on the wall. And that can be found in finding of fact number 20. After the court finds that Mr. Lowe ultimately complied with the commands to show his hand, it said then there's some discrepancy as to whether Mr. Lowe then voluntarily placed his hands against the wall before reaching for his waistband or whether he was forced to place his hands against the wall. So it's after he's shown his hands, when the judge is saying whether he voluntarily complied, there was an order by the officers to put his hands up on the wall. All of the officers testified to that. Well, the officer, in fact, the main one, Campbell, said that he helps him by pushing him against the wall. Officer Campbell, the discrepancy was that Officer Campbell said that he voluntarily went and put his hands up against the wall in response to the command to do so. McGinnis said he was walking slowly to the wall, so then they helped him. In any event... I'm sorry. The record, not the district court's findings, but the testimony at least, suggests that there were two orders given. One was to stop and one was to show hands. At what point in time did Lowe comply with either of those commands? Well, Lowe, according to the district court's conclusions, and findings of fact and conclusions of law, and we're not challenging any of the findings of fact, and I think there's a critical misstatement that Mr. Salzman is making with respect to those findings. The court found that Mr. Lowe took a couple of steps back against the fence. The court never found, never found, that Mr. Lowe took any steps backwards after any orders were given. By the time the orders were given, Mr. Lowe was already back against the fence. And that's critical because that means the submission occurred as of the time of the first order. At that moment, that show of authority, Mr. Lowe submitted. He was seized right at the outset there. And it makes no sense what Mr. Salzman is arguing because if the district court had found that, and he certainly doesn't point to any findings, now he's saying it's implicit in the court's finding, but it absolutely is not. Because if the court had found that, it would have factored it into its reasonable suspicion analysis. But the court didn't factor in any steps backwards at all into the reasonable suspicion analysis. And the reason for that was he is seized as soon as the officers make the first command for him to show his hands, and he's submitted already by coming to a stop against the fence. For a practical perspective, the rule that you're asking the court to adopt would mean that officers who get a tip that someone has a firearm at a particular address, 4 a.m. in the morning, high crime neighborhood, a shooting that has been verified and taken place with a shooter not yet found or apprehended, just a block and a half away, as they approach someone who has hands at the very address they're told this person has a firearm, they instruct them because they have hands in their pockets to take their hands out and show them so that they know that they and others are safe, the person refuses to comply. You're saying that at that point there has been a seizure such that they have the option of either conducting an illegal pat-down because the person is not showing their hands, or turning and walking away and putting both themselves and the public at risk where someone may well, given the tip and the information, have a firearm. How, as a practical matter, as a common sense matter, could we adopt that? Well, first of all, the officers have to operate within the parameters of the Fourth Amendment, and the Supreme Court has made clear what those parameters are in a case like this. Well, the Supreme Court made clear that an anonymous tip of a man with a gun does not provide reasonable suspicion for a stop and arrest, and there is no dispute that they did not have reasonable suspicion at the time that they ordered him to show his hands. So we know that's parameter number one. Parameter number two is that, and the Supreme Court has said this over and over again in Warlof, Royer, that if officers approach without reasonable suspicion, a man, woman, is entitled to ignore the police, to keep his hands in his pockets, to go about his business. The officer has no more authority than any other individual. So with those parameters, if you're asking what should the police do, Judge Becker writing for this court in the United States v. Roperson gave the alternative. The alternative is surveillance. If the officers don't have reasonable suspicion to go up to him at that moment and stop and frisk him, which they don't, there's no dispute about that, they don't have reasonable suspicion, then Judge Becker said the alternative is surveillance. And if they take up a surveillance position, they may very well see some kind of suspicious movement, as officers often testify to. Some kind of furtive gesture, maybe Mr. Lowe or any individual sees the police and he decides to run, and maybe the flight plus the anonymous tip plus the other information gives them reasonable suspicion. Now that's the alternative. Now obviously the Philadelphia Police Department is in a better position than me to come up with the exact procedures officers should follow in anonymous tip cases. But what's absolutely clear from Florida v. J.L. and the other cases is they cannot just go up on an anonymous tip, regardless of the other circumstances here, because they plainly do not provide reasonable suspicion. They can't go up and make that kind of show of authority and command that he take his hands out of his pocket. When they do that and he submits by not fleeing, they've illegally seized him. So Mr. Zausmer has suggested that Johnson is really a holding that is confined to its facts and it's not, doesn't have the broad application, his words, or his thoughts I should say, that you're suggesting that it does. I just want you to respond to that. Yeah, I think that's a mistake. I think Johnson v. Campbell is clear in two respects. One with respect to the timing of a seizure. When the officers in that case made their show of authority, which in that case was the second request that he rolled down his window, the seizure was immediate with that show of authority. Why was it immediate? Because Johnson submitted by not getting up and trying to go away. He just sat in his car. He did not roll down his window, but he submitted by staying put. This court found, and this is extremely important, this court found the seizure was immediate. And because it was immediate, it was put at the moment of the show of authority itself. Mr. Johnson's refusal to roll down that window for the second time wasn't even considered. So here, if Mr. Lowe was seized at the precise moment of the show of authority, the command that he raise his hands, he submits by not moving, just like Johnson submitted by not moving, not getting up out of his car. Just like in Johnson, this court didn't consider the second refusal to roll down the window. This court wouldn't even get to the refusal to take the hands out of the pockets. The second point of Johnson v. Campbell is an individual like Johnson, like Lowe, like any of us, if the police come up to us without reasonable suspicion, we are entitled to say no. We're entitled not to roll down the window. We're entitled not to take the hands out of the pockets. And by doing that, we're exercising our constitutional rights. There's nothing suspicious about it. Mr. Zausman is right. The police can consider innocent acts if they're suspicious. So in Tarrant, the individual's looking in the windows over and over again of the store. It's innocent, but it's suspicious. There's nothing suspicious about saying no to an officer, about ignoring an officer who is approaching without reasonable suspicion. Case after case we cite say that can't provide the officers with the reasonable suspicion they were lacking when they were approached. The government cites not a single case holding to the contrary. They're asking this court to hold something that no court has ever held, that by exercising his constitutional right to keep his hands in his pockets, that provided the officers with the reasonable suspicion they didn't have. No court has ever held that. Do you agree that the point of seizure that Mr. Zausman has asserted is when Mr. Lowe was up against the fence, when he backed up, and the moment in time when he's up against the fence, is that the point of seizure from your perspective? Well, I think he's submit even before that. But the court finds submission by him not fleeing. And he never attempted to flee. When do you submit submission occurred? Immediately. Certainly no later than that first show. I mean, we're looking at it from the point of the show of authority. You're acknowledging the hands in the pocket as not rolling down the windows in Johnson. He submitted by staying put. He always stayed put in front of that house. We have findings by the district court that he took several steps back until he was prevented from moving farther back by the fence. Don't we have to take that into account in addition to the failure to show his hands? If you make the submission, if you make his submission when he came to a halt on the fence, that's fine because no orders had been given at that point. How is that clear from the record? Because if you look at the sequence of the findings, if you look at the fact that the court found that the officer didn't make the commands until they got into close proximity, by the time they got into close proximity, he's up against the fence, which is consistent with two officers' testimony. It's consistent with McGinnis, who said that the entire time he was asking Lowe to take his hands out of his pocket, Lowe was frozen. McGinnis didn't testify to any steps backwards at all. And it's consistent with Pozekta's testimony, who said the commands were being made when they were six to eight feet away. They were approaching from 60. By the time they get to six to eight feet, Lowe is up against the fence. The court, if the court, you know, the somewhat disturbing thing about this, the government asked Judge Joyner to make that finding, to make the finding that he was walking backwards, that he continued to walk backwards after the commands to him were given. And with some energy, Judge Joyner, you can't make that finding because McGinnis says that he was frozen the entire time. McGinnis, I'm sorry, her findings as to McGinnis are that after five to ten commands were given, Lowe took his hands out of his pocket and slowly moved toward the wall. Isn't that McGinnis' testimony? McGinnis' testimony was that he was frozen still when the officers were commanding him to take his hands out of his pocket. McGinnis then said after he took his hands out, he went over to the wall. He went over to the wall in compliance with the next command. Put your hands up on the wall. That's what the courts, that's what Judge Joyner said. Only after five to ten commands were given did Mr. Lowe take his hands out of his pocket and slowly move towards the wall. Then the officers pushed him towards the wall and Lowe reached into his pocket. But there was no, it's clear from the officer's testimony, McGinnis, Campbell, Bazzacca, he was ordered to go put his hands up on the wall. At this point McGinnis is pointing his gun at him to get his hands up. No one was testifying, no one was suggesting that all of a sudden Mr. Lowe went for a walk on his own volition. He was told to put his hands up on the wall. That's why he went over and started to put his hands up. Campbell said that he complied with the demand to put his hands up on the wall. McGinnis said he's moving a little too slow so I shoved him up against the wall. But there was absolutely no suggestion, no finding by the district court that Mr. Lowe just all of a sudden started walking away from the officers after he ultimately complied with the command to put his hands up. The district court found submission later than the second command. The district court looked at this in terms of, all right, I have to find when the show of authority is, it's the second command. There's no dispute that he was wrong about that. So the finding of show of authority, conclusion is second command. He then says, all right, I have to determine whether there's submission at that point. And he says, yes, there's submission. There's no more backing away. Judge Shorner finds he's submitted by not fleeing, by staying put. But that's a conclusion that applies just as well to the first command as it does to the second. The commands are only a split second apart. Except the way you just presented the argument and the facts in the argument is not the way I'm reading what the judge found from Paragraph 11 of this. But in Paragraph 11, I think he's just recounting what one of the officers' testimony is. And then he goes and he makes his own findings when he puts all of the testimony together. It's not in the formal part, I guess, starting at Paragraph 19, but it is under the part of the opinion that says findings of fact. Right. And in those initial findings, what he's doing is he's recounting testimony from each of the officers. And ultimately then he puts it together in his own findings of fact that he makes. Maybe this takes us full circle because if we have those in one part of the findings of fact and then we have 19 and 20 with some important facts as to the stepping back, how far it is. You've suggested it was a couple of steps. We have no information about the distance. If it was, as the district court seems to describe it, more of a retreat because he was prevented from moving farther back, as the district court describes it. Why shouldn't we remand for more specific fact finding and maybe not just writing up of the facts as happened before, but actually taking a testimony to try to ascertain what exactly happened here? Well, I think certainly under the second part of our argument there would be no need to because whatever the exact sequence might be, Mr. Lowe still had the right to say no to the officers and keep his hands in his pockets. And there's no court that has ever said that that can provide reasonable suspicion where the officers didn't have it beforehand. And I think the court's finding is the submission, conclusion is the submission. There's nothing clearly erroneous about it. There's nothing wrong as a matter of law about it. The court found that he submitted. Tell me where I'm wrong here. Assume the background facts here, descriptions given. Mr. Salzman described it as a very specific description to me. I think it's someone's exact description. You could drive through not only North Philly but West Philly, probably South Philly in September and find any number of folks wearing a gray hooded sweatshirt. So I'm not sure how specific it is, but the clothing as general as it was that was given in the description matched where Lowe had on. Police arrived. I assume you have no problem with the fact that a police car went to that scene and got there within a couple minutes of the radio call. That's perfectly okay. I assume you have no problem with the fact that more than one police car went to that scene. There was a backup car that went. And we ended up with a total of four officers. So far, no constitutional problems. Sure. They get to the scene. Rather than sitting there and surveilling or listening to the radio or going for a donut, they decide to get out of the car and kind of call it an investigator approach. But I assume you have no problem with the fact that they decided to get out of the car. Or do you? Well, I think it may be a problem for them. I don't know that that would be the best procedure for the police to use. But, yeah, certainly they can approach. Okay. But it's not a job performance. We're not agreeing on the best procedure here. Certainly as a constitutional matter, they can approach. Okay. So they approach. So far, no problem. Probably nothing's happened with the situation so far. Although I will say this. Mr. Zassmer conceded at the last oral argument that even before they make an initial command, when there's a show of authority, just the fact that you have police cars pulling up, officers getting out and approaching. I know. And you conceded so far no reasonable suspicion. You would not dispute that. Correct. No reasonable suspicion. But they could go in the course of an investigation, get out of their cars, and they start walking toward them. Forget about the haste with which they approach them for a second.  So far, no problem. Now, there's been a report. Sixteen minutes or 90 minutes earlier, shots were fired. And they see that, you know, Mr. Sean Lowe here, they don't know his name yet, but he's got his hands in his pockets. Gosh darn, wouldn't it be a good idea if we asked him to take his hands out of his pockets? So far, is that okay? Or should they not ask him to take his hands out? They can ask, but they can't command. Okay. So, Mr. Lowe, sir, could you please remove your hands from your pockets? Because we're concerned about our own safety here. No problem. But he doesn't take his hands out. Now, where are we now under Terry, under J.L., under Johnson? Where are we right now? Where we're at is that under. . . At least there's nothing wrong. Right. Okay. Right. So the officers haven't done anything wrong, and Mr. Lowe is entitled to say no and keep his hands in his pockets. And that's the Bourbon case, the Fourth Circuit case. Where the Fourth Circuit said that. . . No constitutional violation. He's entitled to keep his hands in his pockets. Being an officer who is somewhat taken with the idea of longevity in life and perseverance, I think to myself, he has a right to keep his hands in his pockets. And, you know, this might be a bossy situation where the court said, he can even turn and walk away. But still, I'm not super comfortable with the fact that his hands are still in his pockets. I'm going to ask him again. Maybe he didn't hear me. Mr. Lowe, could you take your hands out of your pocket? And none say feet away. He doesn't take his hands out of his pockets. So far, please have not done anything wrong. Well, no. Actually, at that point, Your Honor, that would be Johnson v. Campbell, where the officer, the second request to roll down the window, he's not commanding it. Right. He's just asking. The second time he asks, this court finds that that's a show of authority. This court finds Johnson submits, not by rolling down the window, he refuses to do that, but by sitting there. You're getting ahead of me, though. But so far in my scenario, please have not done anything wrong. No. I'm sorry, Your Honor. I'm disagreeing with that in that once they ask for the second time. Can I ask one time? Well, under this court's holding in Johnson v. Campbell, when they repeat it, at that point it's clear to Mr. Lowe, to anybody else, they're not going to be free to say no. They knocked down the window there. And you can assume that Johnson or whoever the coach was heard the knocking and didn't roll the window down. In my scenario, you're saying they should not repeat the command a second time? I'm saying now that once they do, they have made a show of authority. They have communicated to Mr. Lowe. You've got to keep it simple for me. I'm just a fellow. You've got to keep it really simple because it's late in the afternoon, I haven't had lunch. Keep it simple for me. Okay, so now you're making legal conclusions and you're putting law into this thing. This is a problem with the facts here. Have they done anything wrong the second time they say, can you take your hands out of your pockets? They have made a show of authority without reasonable suspicion. So you're back to legal conclusions. Yes. That's why I'm backing up and saying I don't know that they should approach because once they do and he exercises his right to say no, then they're in a difficult position. You don't need reasonable suspicion for a show of authority, do you? Reasonable suspicion is we're looking at that at the point of a seizure where you need submission with a show of authority. So there's nothing wrong with the police making a show of authority, right? Well, yes, Your Honor, because if the person submits, if the individual submits by staying put, now you have an illegal seizure in violation of the Fourth Amendment because they didn't have reasonable suspicion for the seizure. You can't be getting me that far by saying they don't have a right to have a show of authority. If an officer walks up to me and says, show me your ID, I happen to be in a situation where there's been some kind of commotion, that's a show of authority. If an individual citizen walks up and says, show me your ID, I'm not inclined to do it. But if a police officer walks up and says, show me your ID, I'm probably going to do that. You're probably going to do it, but the Supreme Court has said over and over you're not required. That's right. That's a different question. That's a different question. I'm just asking whether or not the officer has a right to have a show of authority. That's a different question as to whether or not I have to comply with it. There's a difference between an officer engaging, attempting to engage you in a consensual encounter and asking you to do something or not do something as part of the consensual encounter. There's a difference between that and the officer making a show of authority. Once he makes a show of authority, the Fourth Amendment is activated, because if the person submits not by necessarily turning over the ID, but by just staying put, he's seized. But in my scenario, you're saying the show of authority is the second time the officer says, take your hands out of your pocket. I think a reasonable person, an objective, reasonable person, is going to feel that they are not free to leave. And that's just Courtaulding and Johnson v. Campbell. So the seizure happens there. Yes. But that test is the test for show of authority. That's not the test for the submission that makes for the moment of seizure. Right. So we need to look at where that submission is. Exactly. And you pointed to the Fourth Circuit case, and Burton was a routine citizen encounter. There were no other factors that figured into reasonable suspicion. So the thing that we have to decide is whether you can take account of the refusal to comply and whether the refusal to comply, when combined with all of the other factual circumstances here, whether that made it go over the tipping point for reasonable suspicion. Yes. Right? And so if you look at the Freeman case, the Second Circuit case, lots of additional circumstances there, probably more than what we have here. You have two 911 calls of a man with a gun. You have the defendant matching the description that the caller gave. You have the defendant walking past the police officer. The police officer asks him to stop. He refuses. He's ultimately tackled. They recover a gun. And the government argues, well, his refusal to stop gets us over the reasonable suspicion line. And the Second Circuit said, no, it doesn't. He had a right to keep walking. He had a right not to comply. Officers came at him without reasonable suspicion. Well, it wasn't part of the thinking that 1 a.m. wasn't so late in New York City? Well, I don't think so.